Cases from the District Courts and a Government Employee Case from the Merit Systems Protection Board. The latter will be submitted on the briefs and will not be argued. The first case is Wyers v. Master Lock Company, 2009-14-12. Mr. Noto. May it please the Court. All three cases in this case should be held invalid as a matter of law. For the sleeve patent, the only difference between the closest prior art and the sleeve patent is the sleeve itself. It would have been obvious for a mechanical engineer... Which is the closest prior art? The closest prior art to the sleeve patent would be the Chang reference, Your Honor, which was a product and a patent, a Chang patent. It's been admitted by Wyers that there are various... I thought down was the closest prior art combined with some of Wyers' own patents. Down is the secondary reference. 37D and down are the secondary references which show the sleeve. The primary references would be Chang or Johnson. We're combining the sleeve from the down patent or from the 37D product onto the Chang reference. But isn't your problem that you have a jury verdict against you? Yes, Your Honor, but here the jury got it wrong. Oh, why? But the jury's entitled to important deference. The sleeve here, the prior art, the 37D and down, which both show the sleeve, was not considered relevant in prior art by the jury. And here where we have strong intrinsic evidence, where the patent specification describes the field of art, that field of art is relevant. And the patent specification here discusses padlocks, it discusses various locking devices. With those statements in the patent specification, locks, padlocks, the 37D and down, all must be found to be relevant and analogous prior art. Mr. Noto, in claim 15, there's recitation of a retaining apparatus. It's a little retainer for the sleeve. 15F, yes, Your Honor. And my question is, I didn't read much discussion about that. Is that an issue? Whether the prior art discloses the retainer or not? No, I don't believe it's that issue, Your Honor. The 37D padlock has a retaining sleeve element on the sleeve itself. So that hasn't been an issue. I see. A similar question with respect to the 649 patent. It seems to me in that patent, you have claim 1 with limitation C1 is a cover, a head cover. Again, is that an issue? Is that disclosed in the prior art? Yes, Your Honor, that's disclosed in the primary references and the head cover is not at issue. So the only thing at issue in that case or the only point of debate is the seal? Yes, Your Honor. Why is it admitted that everything is in the closest prior art with the exception of the seal, which was moved from an internal position to an external position? We have prior art that both shows internal and external seals. In fact, the record is complete with several references that have external seals, padlocks with external seals. What difference does it make whether a seal was moved from an internal position to an external position? The claim covers the seal, the external seal, and your argument is you've got references that show that and render that obvious, that it would have been obvious the one over in Erzgell in the art in light of that. Yes, sir. It seems to me you're arguing another issue about moving seals from internal position to external position unnecessarily. No, Your Honor, we're just simply saying it was a routine design choice. The prior art showed an internal seal on the closest prior art has an internal seal and the padlocks for the secondary references show the external seal. It would have been a routine design choice. In fact, Weyer's own documentation shows that he had both internal and external seal in his design documents and he just simply chose one over the other. And, in fact, you had expert testimony of that effect by Cawthorne, right? Yes, Your Honor. And Weyer seemed to agree that in his testimony that in principle they were the same. Yes, Your Honor. In fact, he said the flange on a padlock, the flange seal on a padlock, was exactly the same way on the trailer hitch receipt below. That was Mr. Weyer's testimony. On the sleeve pad, it seems to me you've got a problem with its prior art 37D references because, as I understand it, that's not a load-bearing use of that lock that's disclosed in the brochure. It's really hooking together a different part of the trailer, if I understand correctly. In other words, it's not the receiver lock, but what I guess might be called, where there's a hitch pin, but rather the coupler lock. Am I misunderstanding here? You are correctly understanding that it's a coupler lock. But the load-bearing is not a limitation in any of the claims. It's an unclaimed feature. No, but it seems to be inherent that if you're going to use it in the hitch pin area, as a substitute for the hitch pin, it's got to be load-bearing, whereas using it in the receiver area, it's not load-bearing, right? Well, every lock has to withstand a certain amount of load. Even as a coupler lock, we're withstanding a certain amount of load. In fact, with the sleeve on, the lock would withstand more load than with the sleeve off. Now, there's nothing in any of the claims that talks about load-bearing, so there's no claim limitations regarding load-bearing, and the 37D lock with the sleeve on is used in various configurations. But not as a hitch pin? It's not used as a hitch pin receiver lock, but it is used in the towing arrangements, so it is relevant in analogous art. Okay, well, it may be analogous art, but it does seem to me it's a bit of a problem for you, whereas the down reference is used as a hitch pin, right? That's correct. With different size sleeves. Correct, and the down reference has a load-bearing sleeve. Yeah. So both the 37D and down are within the field of endeavor of an experienced lock designer. Both 37D and down solve the same problem as wires in the same way, and therefore both must be found as relevant and analogous art. Here the patent specification, the claims, and the prosecution history all support that locks are relevant and analogous art, and as both the Sundance and the In Re Wood case show, the patent controls here, and so there is more than substantial evidence to find both the 37D and the down reference to be relevant art within the scope and content of the ordinary skill of art, the person who's a locksmith or locksmithing art. Once the 37D and down are in the proper scope and content of the prior art, then these patents are invalid because there's explicit motivation, implicit motivation, and common sense that drives the combination of taking the sleeve from the 37D or down and placing it on the primary references. In the 37D packaging material and in the 37D price list, it describes that the sleeve accommodates different size apertures. It specifically talks about the shackle fitting a half-inch diameter sleeve, a half-inch diameter hole with the sleeve on, and a nine-thirty-seconds-inch diameter hole with the sleeve off. The 37D was specifically marketed and sold to fit two different size apertures. We also have expressed motivation in the down patent. The down patent specifically at column three states, quote, a steel sleeve is provided as an optional feature, and quote, sleeves of different external diameter may be provided for the attachment of trailer towing eyes of different internal diameters. In other words, if you were on a jury, you would have decided differently. Yes, Your Honor. Even if the motivation here, which is explicit, is somehow disregarded, we have implicit motivation, we have common sense. A person of ordinary skill in the art here is going to be a mechanical engineer and an experienced lock designer. They would understand that you can put a sleeve on the shank. You said a little while ago, the question is whether there is substantial evidence to find the patents invalid. That's not the test. The test is whether the jury has substantial evidence to uphold them. And the trial court laid out a list of seven considerations which could have influenced the jury in its Shea-Morrell opinion. Well, Your Honor, the test on the ultimate conclusion of obviousness here is for the court to decide. It's a de novo review. It's a legal standard for the court to decide. Based on factual considerations. Based on factual considerations. And the underlying factual consideration here, which is at issue, is, is the 37D or the down reference within the scope and content of the prior art? And there is not substantial evidence to support a finding that 37 or down is not within the scope and content of the prior art. The patent specification here controls and the patent specification clearly sets out what the art is. There is not substantial evidence for any finding that they're not relevant. Once they're relevant, the conclusion is obvious. It just naturally follows. I mean, the result of placing the sleeve on a shank is predictable. You're going to get a larger, wider shank than you would with the sleeve off. So, are you challenging the district court's findings of, or determination of what the jury findings were implicitly? These seven implicit findings that were listed in the order. Yes, Your Honor. The district court here erred in accepting the implicit jury findings that locking devices, such as padlocks, were not relevant or analogous art to a person of ordinary skill in the art of locksmithing. No reasonable jury could have found that padlocks were not relevant and analogous art. Also, the district court erred in accepting that one skilled in the art would only look to hitch pin locks. It would not look beyond hitch pin locks to any other type of locking devices. No reasonable jury could have found that all other locking devices and all other locksmith art is not relevant. So, yes, those district court findings were in error in accepting those implicit jury findings. Secondary considerations here. Did you make any determinations about how the jury could have found that the combination of down in the earlier patents were non-obvious? I believe the district court's implicit findings all relate to the scope and content of the prior art issue, and that was the primary focus of the district court's JMLL decision on obviousness. Well, I mean, at the time of 3851, he seems to be addressing padlocks here and finding it would not look to padlocks. Right. The district court is saying you would not look to padlocks to solve the problem of the claimed invention. Where does he say that the down patent wouldn't be relevant prior art? On 3851, about halfway down before the end of the first part, the opening paragraph, he discusses the down patent. And he says at the end, the very last line, it wouldn't be relevant prior art. Mr. Miller, you're well into your rebuttal time. If that's what you wish to say, you can consume it or save it. All right. Mr. Hoge, is it? I pronounce it Hoge, Your Honor. Hoge. Hoge. Virginian pronunciation. One syllable. That's correct. It's Old English for pig. Your Honor, I did want to follow up on, in the 649 patent, the head cover is as part of the claim and is an issue simply because there's two functions to the seal. It is to seal the rod in the hole, if you will. And then it is also to provide bumper. It is in a busy environment of figures 13, so it does have to provide protection to the locking head and not get in the way of the maneuvering of the rod into the locking head. And I can get into that. Well, let me ask you about the seal patents. It seems to me that what you had before the jury was testimony by Costley that the seal patents were obvious. And then you had no direct rebuttal to that. In fact, Weyers himself seems to agree that, in principle, the seal here is the same as in the prior art. So I guess with respect to the seal patents, I'm having a hard time finding how the jury could find non-obviousness when there seemed to be unrebutted testimony of obviousness. Well, first and foremost, the combination of padlocks with barbell locks is hindsight reconstruction. That was ruled on by the Patent Office. There was absolutely no motivation to combine those pieces of art. But secondly, on the merits of what you're talking about, there was testimony from Mr. Weyers that the jury believed that there is a great deal of more complexity than just trying to prevent water from slipping down a rod. That's the principle that we were talking about here. But if you take the testimony of Mr. Weyers, that we're looking for seal and protection in this busy environment, and we're looking at the prior art, there is no prior art showing a linear shank lock being sealed from the exterior with a flange. Well, nobody disputes that, but he's saying in principle it's the same thing. What he said in principle that was discussed over the course of seven days of testimony amongst the experts is that pressing upon the side is going to prevent liquid from going down a rod. I mean, that's the principle. You have to seal something. Every word that says a seal, you have to do that. You have a shift boot on a shifting rod is going to have to somehow seal. There's just no way to get around that. That's the job of sealing. And so that's what he's saying when he's saying yes, in principle. But the fact of the matter is you have vertical orientation versus horizontal orientation. You've got the – there's two pieces to a padlock, and there it is. Wait, wait. He said on 347, he was asked the question, but the way the flange seal works with a tight rubber seal around the shackle, that works the same way, doesn't it? He said, I think, in principle. Well, but the way the flange seal works with a tight rubber seal around the shackle, that works the same way, doesn't it? Yes, in principle. Right. What it is, is it's making a tight fit on this pin. Is there anything else that's called for in the claim? Well, yes. This claim was amended around their principle padlock patent, which is the heel patent. But the claim doesn't have any other limitations with regard to orientation or these other factors that you started referring to a moment ago. So the question is, what's really lacking in the prior art that would suggest to a jury that this is unobvious? What's lacking in the prior art is the fact that nobody, no person of ordinary skill in the art that's working with a linear shank lock would consider going to padlocks. Who said that? Well, who said that? Well, Mr. Wire said that. Where? Well, I would suggest to you that he says it on pages 841-78, 4191, 4178. Just show me specifically where he says that somebody, someone skilled in the art wouldn't look to this other art. Where does he say that? 4346 and 4347. I don't see that he testifies that somebody wouldn't look to this other art. What he says in essence is in the context of the trial, Your Honor, on line 24 question. And this is 4346. But is there anything more difficult about putting a rubber coating over one shape of lock, say a barbell, as opposed to putting a rubber coating over a padlock? Answer. Well, it would be a little bit. Because you're talking a single point of contact with a barbell lock, one point, whereas a padlock has a U-shaped shackle with two points of contact. So in a locked position, the coupler can't be removed. I mean, there's just different structural elements. It's not a direct pass over. But that's not the same as saying that someone skilled in the art wouldn't look to this other ceiling art in this connection. He doesn't say that. He says, I'm sorry, but he does say that. Further on, it's not a direct pass over, or the technology doesn't flow directly over. I mean, I think it's different. That says that. That's what the jury heard. What about the down patch? Why isn't that relevant for the respective sleeve? The down patch is an interesting situation. They didn't put it on in their case in chief. The down patch shows a hitch pin, right? It shows a type of hitch pin. That's correct. But it doesn't have a central teaching. You can't get there from the down patch. The central teaching of the sleeve patch is that you can take a sleeve, a seamed tube, if you will, and you can change the physical strength of a pin, a load-bearing pin from a half inch to a five-eighths inch pin, if you keep it snug on the pin and if you keep it snug in the aperture. But it does disclose that you can use a sleeve to accommodate a different opening in a hitch environment. It teaches, if you look at it, there is a wide gap. And what it teaches is what Wyer said it taught, which is that it is a bushing. It is not a load-bearing sleeve, and it doesn't bear the load that we're talking about here. It bears a load of a bushing, which is to prevent friction on the underlying pin. But the claims don't call for any load-bearing. Unfortunately, well, actually that's not the case, Your Honor. I beg to differ. If you look at Claim 15, that says a hitch pin. Well, it doesn't say anything about load. It says a locking hitch pin. These are limitations that exist in a real world. But isn't down showing a hitch pin? No, it shows a hitch pin, but it doesn't show changing the diameter of the hitch pin in the apertures. All of this testimony that we've actually heard from the attorneys never occurred at trial. These documents do not speak for themselves. It is not a lock. Yes, it is a hitch pin, but there is no sleeve changing the diameter in the apertures. No, but it changes the diameter to accommodate the opening in the eye of the other member of the hitch. But there has to be a significant amount of play in the eye, and the limitations in every one of these claims is that it has to have snug-fitted engagement. These things will not work. If in the environment of carrying a load, it will not increase the strength of the chain. Where do any of the claims call for snug-fitting engagement? Well, we have Claim 15E, a sleeve for selective engagement, the word engagement. We have in Claim 19 for alternative close-fitted insertion, mated engagement with the second aperture, mated engagement. We have close-fitted insertion, close-fitted insertion in Claim 21. We have engaged position. There is a discussion, isn't there, about the sleeve to accommodate the size of the pin, which seems to me is a teaching, is it not, of accommodating those two so that there is some sort of mating engagement? No, if you look at the down patent, the actual reference itself shows in the reference. In Figure 2, there is a space there. It shows a space there. What page are you on? I'm on page Fig 2. No, no, what page of the appendix? What page of the appendix? 9885. It has to have play in there because this sleeve takes a rotational force because this towing eye, and by the way, nobody has ever seen this in reality, the towing eye has to turn on this sleeve, and that's why the sleeve is a bushing. It is not, and you'll see that the sleeve does not go into the apertures and increase the diameter, the effective load-bearing diameter of the hitch pin. That's the central teaching of this wires invention. We have unexpected results here. Wires has shown that you can take this sleeve that everybody thought was kind of crazy and you can put this on a half-inch pin, making it a five-eighths inch pin, and it will actually be stronger than a solid five-eighths inch pin. Now, the jury heard that. What difference does that make? What difference does it make? The claims don't have any requirement that putting the sleeve on make it stronger. Do they? Do they have such a requirement? Yes, they do, Your Honor. I believe in the real-world environment of claim 15, for example, of the 115, we have a locking hitch pin device, a locking hitch pin device. Where does the language of the claim say anything about making it stronger? Well, what makes it stronger is that you can put this. It isn't a method claim. It's a structure claim. What the unexpected results are is that, first of all, there's teaching away evidence in the record by wires. Nobody wanted to put this sleeve in this hitch pin environment simply because it would collapse. What he showed was that there was a way to do it, and he did that. If you look at the 37D package, teaching away in the instructions, you want to use it on a hitch and take the sleeve off. We're not talking about 37D. Well, I understand. You don't see in the down patent that sleeve in the apertures. First of all, we've never had any discussion about what is an aperture at the trial. Is the toe eye an aperture? This is something attorneys are making up at this point in time. There's no expert testimony on that. The apertures that we're talking about isn't the toeing eye. It's the apertures that are going to be bearing the load when this thing is being pulled on this hitch pin. So the load and down, when it's being toed, are in the two apertures that are on either side of that sleeve. The sleeve doesn't do anything to change the load or even take the load because the load is being buried in those two apertures. So it's a load-bearing aperture that we're talking about and down. But we have everything. We have costly dispersing the 37D. We have wires tons of teaching away. We have Master Lock, their own engineers, with both the sealing patent and both the sleeve patents, they're trying to patent the same thing. They don't believe that. I don't read the application for the Master Lock sleeve patent as saying that there's anything novel about the sleeve. Am I mistaken about that? Yes. Where does it say that? They struggled for a year to come up with this. In 8395, they begin their design, and they're talking with their... No, but where does the application say that there's anything novel about the sleeve? I looked for it. I didn't find it. All right, so it's A7623. The new design has a cover made... 76... 7623. Okay. Underneath the second one, the new design has a cover made. And then on page 7625, it talks about the novelty. And you can see, if you go from the disclosure of 8395 in 2002 to the disclosure in 7626, you can see that they rejected the padlock prior art and didn't even cite it as pertinent prior art. You're not responding to my question. My question is, where does the application for the Master Lock patent that has the sleeve in it say that there was anything novel about the sleeve? Your Honor, with the word new. That's what they mean in their disclosure as being novel. And then in A11453 is their patent application on the seal. Yeah, but that patent application doesn't say there's anything novel about the sleeve. We're talking about the sleeve, not the seal. Well, they have, Your Honor, they have a claim where they are, for example, there's several claims in here where they have this cover, and when they file a patent application under oath, they are telling the Patent Office, we believe this is novel and non-obvious. Not every feature. They're saying there's something novel about it, but that doesn't mean that every feature is novel. Well, this was the intent of their patent application was to cover the elastomeric invention. Mr. Hogue, your time has expired. Thank you. So we will hear a rebuttal by Mr. Noho, which should be limited to rebutting what you just heard. Yes, Your Honor. Let me address the head cover first and take care of that. First, there was no dispute at trial that there was patentability because of the head cover. The primary references here have head covers. The 6-1-2-1 Pro Series Lock, which is Master Locks, which is at A-48-19 and A-48-21, has the head cover. Regarding Down, Down is a lock. The Down patent, in the patent itself, talks about a lock. It mentions the word six times, and it talks about having a lock mechanism. In Column 2 of the patent, it talks about any convenient locking mechanism can be used. So Down was intended to be used with a locking mechanism. Therefore, it does have a lock and would be considered relevant to a lock designer. On the close fitting, the primary references teach close fitting. The Chang, the Johnson, the trailer hitch receiver locks that existed fit in the hole, and they fit in that hole in a close fitting manner. So everybody knew that when you built this, it had to fit in the hole. There's nothing new about the fact that it was close fitting. So the only thing missing was the teaching of the use of a sleeve to accommodate a larger opening. Exactly, Your Honor, which is in the secondary references. Regarding unexpected results, first of all, the unexpected results here relate to claim features that don't exist. We're talking about it was unexpected that it could support the load. Well, there's nothing in the claim about load. So that's the first thing. Second, Down clearly teaches us a load-bearing sleeve that would bear the load. So there can't be any basis for unexpected results. And the teaching away hasn't been argued until now, but the teaching away is the same here as the unexpected results. He's saying it teaches away because you wouldn't think that the sleeve could support the load. But here, Down tells us that a sleeve can support a load. So there is no teaching away. Are there any questions, then? If not, thank you very much, Mr. Nuttall. We'll take the case on the floor. Thank you. Thank you.